Darin Gatti

```
1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
                       -   -   -
3    ROBERT HOLTON           :
                             :
4         v.                 :
                             :
5    BOBBY HENON, et al.     :NO. 18-2228
6
                       -   -   -
7
                    August 6, 2021
8
                       -   -   -
9
10            Oral deposition of DARIN
11   GATTI, was held at CITY OF PHILADELPHIA
12   LAW DEPARTMENT, 1515 Arch Street, One
13   Parkway Building, 14th Floor,
14   Philadelphia, Pennsylvania, commencing at
15   10:30 a.m., on the above date, before
16   Emily Andreasen, a Court Reporter and
17   Notary Public for the Commonwealth of
18   Pennsylvania.
19
20
21
22
23                     -   -   -
          GOLKOW LITIGATION SERVICES
24     877.370.3377 ph| 917.591.5672 fax
```

Golkow Litigation Services                    Page 1

---

Darin Gatti

```
1    A P P E A R A N C E S:
2
3    DURHAM & JAMES P.C.
     BY:  STEPHEN A. DURHAM, ESQUIRE
4    320 West Front St.
     Media, Pennsylvania 19063
5    (610) 565-4750
     sdurham@dandjlaw.com
6        Representing the Plaintiff
7
8    CITY OF PHILADELPHIA LAW DEPARTMENT
     BY:  MEGHAN CLAIBORNE, ESQUIRE
9    1515 Arch Street
     One Parkway Building
10   14th Floor
     Philadelphia, Pennsylvania 19102
11   (215) 686-1776
     meghan.claiborne@phila.gov
12       Representing the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services                    Page 2

---

Darin Gatti

```
1                  I N D E X
2                    -   -   -
3
4    WITNESS                       PAGE
5    DARIN GATTI
6        By Mr. Durham             4
7
8
9
10            E X H I B T S
11                  -   -   -
12   NO.        DESCRIPTION        PAGE
13   Gatti A    Google Maps        52
                Image - 4094 Richmond
14              09/2018
15   Gatti B    Google Maps        52
                Image - 4085 Richmond
16              09/2014
17   Gatti C    Google Maps        52
                Image - 4094 Richmond
18              11/2018
19   Gatti D    Google Maps        52
                Image - 4085 Richmond
20              08/2019
21
22
23
24
```

Golkow Litigation Services                    Page 3

---

Darin Gatti

```
1            (It is hereby stipulated and
2        agreed by and between counsel for
3        the respective parties that
4        signing, sealing, certification,
5        and filing are waived; and that
6        all objections, except as to the
7        form of the question, are reserved
8        until time of the trial.)
9                    -   -   -
10           DARIN GATTI, after having
11       been duly sworn, was examined and
12       testified as follows:
13                   -   -   -
14             EXAMINATION
15                   -   -   -
16   BY MR. DURHAM:
17       Q.   Mr. Gatti, my name is Steve
18   Durham.  I'm the current attorney for
19   Mr. Robert Holton.  You're here today
20   voluntarily, and I thank your attorney
21   for having you show up for this
22   deposition.
23           We've already discussed
24   prior to the deposition that you're
```

Golkow Litigation Services                    Page 4

Darin Gatti

1 familiar with the rules of a deposition,
2 so I'm not going to go over them with
3 you.  Is that all right with you?
4       A.     Correct.
5       Q.     Thank you.
6              How long have you been
7 employed by the City, sir?
8       A.     Just about 40 years.
9       Q.     And do you recall when you
10 were first hired?
11       A.     In June of 1982.
12       Q.     And what position did you
13 have at that time?
14       A.     I started off as a graduate
15 civil engineer.
16       Q.     So -- and where did you
17 graduate from?
18       A.     Drexel University.
19       Q.     Okay.  And your degree is in
20 civil engineering?
21       A.     Yes.
22       Q.     Okay.  And your current
23 position with the City?
24       A.     I'm the chief engineer and

Darin Gatti

1 president of the Board of Surveyors.
2       Q.     Okay.  Back in 2018 -- in
3 October of 2018, to be precise, did you
4 hold those positions also?  Chief --
5       A.     Yes.
6       Q.     Chief engineer and president
7 of the Board of Surveyors?
8       A.     Yes.
9       Q.     And what city department are
10 you in?  I saw something that said the
11 Streets Department?
12       A.     Yes.  Streets Department,
13 yes.
14       Q.     And is the Streets
15 Department a part of any other city
16 department like L&I or any of the other
17 city agencies?
18       A.     No.  The Streets Department
19 is a standalone department.
20       Q.     And what is the general duty
21 of the chief engineer of the Streets
22 Department?
23       A.     My duties -- I oversee
24 surveys, design and construction for the

Darin Gatti

1 Streets Department.
2              So my role is quite varied.
3 I get involved in all kinds of aspects
4 from project management to managing
5 design projects, the Streets Department
6 transportation engineers, Streets
7 Department bridge engineers all report to
8 me.  Our construction unit that manages
9 all of our city street construction is
10 under my guidance, as well as our city
11 plans unit and five survey districts.
12              The city plans unit and five
13 surveys districts is the Bureau of
14 Surveys.  They work closely with the
15 Records Department and as well as
16 everyone else in the Streets Department
17 on managing the lines of the streets,
18 property surveys, they do property line
19 dispute resolution.
20              So we get involved in many
21 things.  And I work with other
22 departments, Parks & Rec.  I work very
23 closely with Licenses & Inspections.
24 Whenever a -- there's a violation from

Darin Gatti

1 Licenses & Inspections and there's a
2 question about the responsibility, say,
3 of a retaining wall or a sidewalk, my
4 survey districts do determinations of
5 responsibility.  They do property
6 stakeouts for the general public as well
7 as doing subdivision reviews and
8 subdivision plans.
9       Q.     You're familiar with Mr.
10 Holton's property, the one at 4085
11 Richmond Street here in Philadelphia?
12       A.     He doesn't have a property
13 at 4085 Richmond Street.
14       Q.     Where is his property
15 located?
16       A.     His property's located on
17 Delaware Avenue.  He has two parcels in
18 his current deed.  One is on Delaware
19 Avenue and the other one is directly
20 behind that on what's commonly known as
21 Carbon Street but is actually a railroad
22 right-of-way.
23       Q.     Does his property that you
24 just described have two addresses?  One

Darin Gatti

1 on Delaware Avenue and one on Richmond
2 Street?
3       A.    Currently one of them has --
4 is the OPA has just designated one of
5 them as the real property as being a rear
6 address on Richmond Street, which means
7 it does not actually front on Richmond
8 Street, but it's a rear address.
9       Q.    So -- and that rear address
10 would be 4085; am I correct?
11       A.    Not sure what the actual
12 address is.  OPA just designated that
13 last week.
14       Q.    What is OPA?
15       A.    The Office of Property
16 Assessments.
17       Q.    I knew you knew it, but I
18 didn't know it and I'm not sure the court
19 reporter knew it.
20       A.    They're the ones that handle
21 the tax records.  And they just recently
22 corrected some confusion in property
23 addresses for Mr. Holton's property that
24 fronts on Delaware Avenue as well as a

Darin Gatti

1 couple other properties in the area that
2 had misleading addresses.
3       Q.    And you would consider 4085
4 Richmond Street to be a misleading
5 address for Mr. Holton's property?
6       A.    Yes.
7       Q.    Does OPA report to you?
8       A.    No.
9       Q.    Okay.  Do they work hand in
10 glove with you?
11       A.    Well, we give -- we provide
12 them information in order to do their
13 project, their -- you know, they --
14 they're not the Records Department.  They
15 don't actually handle property records,
16 but they manage the taxing of properties
17 and assessing -- you know, assigning
18 property value -- property references,
19 you know, the reference numbers that they
20 use to identify properties, keeping track
21 of all the parcels, things like that, for
22 tax purposes.
23       Q.    And how did you learn that
24 they just last week corrected Mr.

Darin Gatti

1 Holton's description?
2       A.    I actually received an email
3 from them and that notice was also sent
4 to Mr. Craig Sopen [ph] who is one of Mr.
5 Holton's other attorneys.
6       Q.    And since you mentioned
7 Mr. Sopen -- he's involved with the
8 eminent domain case on Delaware Avenue,
9 am I correct, when Delaware Avenue was
10 widened in, I think, 2012?
11       A.    Yes.
12       Q.    Okay.  I'm correct about
13 that.
14             And Mr. Holton's property
15 that faces Delaware Avenue, part of that
16 was taken for the widening of Delaware
17 Avenue; am I correct?
18       A.    No.
19       Q.    The 5,377 square feet that
20 ended up belonging to Mr. Holton, you're
21 saying no?  Can you explain to me why
22 you're saying no?
23       A.    That property that was
24 condoned was not his property at the

Darin Gatti

1 time.  The remainder parcel was
2 transacted to him by the previous owner.
3       Q.    Which was the railroad line?
4       A.    Yes.  The successor to the
5 railroad line.
6             But at the time of
7 condemnation, he was not the owner of
8 that property.
9       Q.    Do you know whether at the
10 time of condemnation Mr. Holton was using
11 that portion of the property as ingress
12 and egress to his entire property, both
13 the front lot and the back lot?
14             MS. CLAIBORNE:  Objection to
15       form.
16             You can answer.
17             THE WITNESS:  To the front
18       lot, he crossed over that parcel,
19       not the back lot.
20 BY MR. DURHAM:
21       Q.    Was there access to the back
22 lot to that parcel?  If you know.
23       A.    At the time of condemnation,
24 he was illegally using Frankford Creek

Darin Gatti

1  Right-of-Way as part of his access --
2  well, actually, he was actually -- not
3  only for access, but he was operating on
4  the Frankford Creek Right-of-Way with an
5  office and a truck scale.
6      Q.    And that was off the
7  Richmond Street side --
8      A.    No.
9      Q.    Close to Richmond Street?
10     A.    That was off of Delaware
11  Avenue.
12     Q.    Nothing off of Richmond
13  Street?
14     A.    Nope.  He had no access from
15  Richmond Street.
16     Q.    Do you know the address of
17  4087 Richmond Street?
18     A.    I -- I'm familiar with the
19  number, yes.
20     Q.    And what does that
21  represent?
22     A.    There is a -- it's been
23  referred to as the piece of ground which
24  is actually part of the Frankford Creek

Darin Gatti

1  Right-of-Way.
2      Q.    And the Frankford Creek
3  Right-of-Way was what?  Can you describe
4  for me what it is?
5      A.    Frankford Creek is -- in
6  this location, it is actually a manmade
7  creek.  Frankford Creek was relocated for
8  the construction of the Betsy Ross
9  Bridge.
10          During that time, the City
11  purchased and/or condemned land along the
12  current location of the Frankford Creek
13  for the construction of Frankford Creek
14  and divert it from its previous location.
15     Q.    And could you tell me
16  approximately how large a piece of
17  property the Frankford Creek Right-of-Way
18  at this location is?  How long, how wide,
19  how many acres, whatever description you
20  care to use.
21          MS. CLAIBORNE:  Objection to
22      form.
23          Can you just specify which
24      portion you're talking about?

Darin Gatti

1          MR. DURHAM:  The portion
2      that has the address of 4087.
3  BY MR. DURHAM:
4      Q.    Could you describe -- 4087
5  is Richmond Avenue; am I correct?
6      A.    That's what it's been
7  referred to, but there's no official
8  address in the OPA records for that.
9          However, the piece of ground
10  that is adjacent to the Frankford Creek
11  and Richmond Street is the Frankford
12  Creek Right-of-Way, and it extends
13  between the Frankford Creek -- the creek
14  itself -- and the railroad, which crosses
15  over Richmond Street and runs parallel to
16  Lewis Street eventually crossing over the
17  Delaware River into New Jersey.  I
18  believe that's -- Conrail is that rail
19  line there.
20          So at Richmond Street,
21  the -- between the creek and the railroad
22  is all Frankford Creek Right-of-Way.
23  That goes back approximately 1,000 feet,
24  somewhere around there, 1,000,

Darin Gatti

1  1,200 feet.  I forget the number off the
2  top of my head.
3      Q.    That's all right.
4      A.    And then at that point, the
5  Frankford Creek Right-of-Way narrows down
6  a bit and when you -- as you get to, say,
7  Carbon Street and Delaware Avenue, there
8  is some private property that exists
9  between the creek and that same railroad.
10     Q.    And one of those parcels in
11  that area is the one that Mr. Holton
12  owns.  You called it the back lot?
13     A.    There are four parcels in
14  that area at the -- just north of Carbon
15  Street, there are two parcels, the -- Mr.
16  Holton's back lot, and a property owned
17  by, I believe, Oliver Painter.
18     Q.    I believe --
19     A.    I don't know if he's still
20  the owner or not, but at one time he was.
21          And then as you -- I guess
22  east of Carbon Street, between Carbon
23  Street and Delaware Avenue, there are two
24  parcels, which is -- one of which --

1  well, actually, three parcels.
2            One of which is Mr. Holton's
3  auto salvage yard.  The other one is
4  owned by an energy company.  Is it
5  Trigent, I think?  It's a gas company,
6  basically.  It's -- and they have a gas
7  pipeline that crosses the Delaware River,
8  and they have it stationed there on
9  Delaware Avenue.
10            And then there are -- then
11  there is a remnant parcel from the
12  original railroad property, which
13  encompassed pretty much that whole area.
14            The railroad over the years
15  over almost a 100-year span had
16  subdivided a railroad property there,
17  which, at one point was I believe Penn
18  Central, and sold off pieces of it --
19  part of it to the railroad -- sorry --
20  part of it wound up as part of the gas
21  company, and part of it wound up -- part
22  of it was sold to a Mr. Claus and then to
23  a Mr. Bonn Christiani and then from Bonn
24  Christiani to Holton for the auto salvage

1  business that he has there.
2            However, the railroad
3  property did not sell off what was
4  commonly referred to as the beds of
5  Roxborough Street and Delaware Avenue.
6  The deeds specifically excluded that
7  parcel -- it's like an L-shaped parcel.
8            And that actually wrapped
9  around -- was in between Mr. Holton and
10  the energy company and wrapped around to
11  the front of Mr. Holton's property, so it was
12  actually between him and Delaware Avenue.
13       Q.    Thank you.
14            When did you first become
15  aware that Mr. Holton may be operating a
16  business on City property?
17            MS. CLAIBORNE:  Objection to
18       form.
19            If you could clarify what
20       property you're referring to.
21            MR. DURHAM:  I'm talking
22       about the Frankford Creek
23       Right-of-Way.
24            THE WITNESS:  Frankford

1            Creek Right-of-Way?  That was in
2            20 -- probably 2007, 2008.
3  BY MR. DURHAM:
4       Q.    And how did you become aware
5  of that?
6       A.    We were developing plans for
7  an extension of Delaware Avenue from
8  Lewis Street up to Orthodox Street.
9       Q.    And that would be -- the
10  Delaware side of Mr. Holton's property,
11  was he operating on part of the City
12  property in that area of the Frankford
13  Creek Right-of-Way?
14       A.    Yes.
15       Q.    Was he operating on any
16  other part of the Frankford Creek
17  Right-of-Way that you were aware of?
18       A.    At the very -- at the
19  beginning of the project, no.  It was
20  just the -- shall we say the eastern end
21  on the Frankford Creek Right-of-Way near
22  Delaware Avenue.
23       Q.    Did you subsequently learn
24  that Mr. Holton and/or his tenant, Mr.

1  Creedon, operating under the term "K
2  Squad," was operating a business on the
3  Richmond Street end of the Frankford
4  Right-of-Way?
5            MS. CLAIBORNE:  Objection to
6       form.
7            You can answer.
8            THE WITNESS:  Yes.
9            That was somewhere between
10       2010 and 2012.  It appeared at the
11       time when we removed him from the
12       Frankford Creek Right-of-Way down
13       on Delaware River, he moved
14       into -- he appeared to move into
15       that -- the portion -- the same --
16       you know, the same right-of-way up
17       near Richmond Street.
18  BY MR. DURHAM:
19       Q.    Do you know whether he was
20  operating at the Richmond Street end of
21  the Frankford Creek Right-of-Way prior to
22  you removing him from the Delaware Avenue
23  and the eastern end of the Frankford
24  Creek Right-of-Way?

Darin Gatti

1    A.    No, he was not.
2    Q.    You've been by the property
3  numerous times, I presume?
4    A.    Yes.
5    Q.    And would I be correct that
6  it's the -- Richmond Street leads you
7  right to the Betsy Ross Bridge; does it
8  not?  It's right --
9    A.    Yes.
10   Q.    -- on the other side of the
11 right-of-way.
12         And the City, I think,
13 claims to have owned it since 1951; would
14 that be correct to your memory?
15         MS. CLAIBORNE:  Objection to
16         form.
17         Can you identify what piece
18         of property you're talking about?
19         MR. DURHAM:  I'm talking
20         about the Frankford Creek
21         Right-of-Way.
22         THE WITNESS:  The -- yes.
23         The City purchased that around
24         1950, 1951.  We have jury plans,

Darin Gatti

1         which document the condemnation of
2         the land there.
3  BY MR. DURHAM:
4    Q.    And to the best of your
5  knowledge, has anything been done with
6  the Frankford Creek Right-of-Way in that
7  area from Richmond Street to Delaware
8  Avenue in the last 70 years?
9         MS. CLAIBORNE:  Objection to
10        form.
11        THE WITNESS:  You have to
12        define that.
13 BY MR. DURHAM:
14   Q.    Has any development been
15 taken place by the City or with the
16 City's approval on that portion of the
17 Frankford Creek Right-of-Way from
18 Richmond Street to where you said it ends
19 at Delaware Avenue?
20        MS. CLAIBORNE:  And I'm just
21        going to place a standing
22        objection to the extent that
23        discovery in this case is being
24        used to obtain information for a

Darin Gatti

1         subsequent adverse possession
2         proceeding that is improper.
3         I'm not going to instruct
4         him to answer, but I'm placing
5         a standing objection on the
6         record.
7         You can respond.
8         MR. DURHAM:  No objection to
9         that.
10        THE WITNESS:  So the
11        property has been in continuous
12        use by the City for, you know,
13        since the -- since its purchase
14        back in the 1950s.
15 BY MR. DURHAM:
16   Q.    Was there a fence across the
17 Richmond Street end of the Frankford
18 Creek Right-of-Way property?
19        MS. CLAIBORNE:  Objection to
20        form.
21        If you can identify what
22        time you're talking about.
23        THE WITNESS:  I believe so.
24        I can't say for the whole

Darin Gatti

1         70 years, but for -- you know, I
2         do -- you know, there is a fence
3         there now.  It's been there for
4         some time.
5  BY MR. DURHAM:
6    Q.    And do you know whose fence
7  that is?
8         MS. CLAIBORNE:  Objection to
9         form.
10        THE WITNESS:  It's on City
11        property.  It's now the City's
12        fence.
13 BY MR. DURHAM:
14   Q.    But you don't know whether
15 the City erected it or not; do you?
16   A.    I do not know who erected
17 it, no.
18   Q.    Do you know your codefendant
19 in this case, Bobby Henon?
20   A.    Yes, I do.
21   Q.    And what is Mr. Henon's
22 position in the City?
23        MS. CLAIBORNE:  Objection.
24        I thought you meant mental

Darin Gatti

```
1        position.
2            THE WITNESS:  He's a
3     councilperson.
4   BY MR. DURHAM:
5        Q.    And is he in charge of the
6     Streets Department?
7        A.    No.
8        Q.    Did you and Mr. Henon have
9     any conversations about Mr. Holton's use
10    of the City -- what you believe to be the
11    City property?
12       A.    Yes, we had.
13       Q.    And were they written
14    communications or verbal or both?
15       A.    It was mostly verbal.
16           MS. CLAIBORNE:  And I'll
17       just instruct to the extent that
18       these were communications with
19       counsel, either myself at
20       Jefferson or another attorney for
21       the purposes of obtaining the
22       advice of counsel, I'm instructing
23       you not to respond, but otherwise
24       you can respond.
```

Darin Gatti

```
1            MR. DURHAM:  I'm not asking
2       him any questions about any legal
3       representation.  I'm asking him
4       about Mr. Henon, who I understand
5       is not an attorney; is that
6       correct?  Do you know him not to
7       be an attorney?
8            THE WITNESS:  I do not know.
9            MS. CLAIBORNE:  Sorry.  To
10       clarify, I meant if he and Bobby
11       Henon were jointly seeking
12       counsel.
13           MR. DURHAM:  Oh, okay.
14       Thank you.  No, I would not ask
15       about that, but I appreciate your
16       concern there.
17   BY MR. DURHAM:
18       Q.    Did you have any emails with
19    Mr. Henon about removing Mr. Holton from
20    the property?
21           MS. CLAIBORNE:  Objection to
22       form.
23           If you can clarify the time
24       period and the property at issue.
```

Darin Gatti

```
1   BY MR. DURHAM:
2        Q.    Yes.  In the time period
3     between, I think you said 2010, 2012, you
4     realized that Mr. Holton had moved his
5     operation from what you described as the
6     east end of the Frankford Creek
7     Right-of-Way property to the northern end
8     of Frankford creek onto the Richmond
9     Avenue side.
10           Did you have any
11    communications with Mr. Henon between
12    2010 and 2018 October when you removed
13    Mr. Holton from the property?
14       A.    I -- we had some verbal
15    communications.
16       Q.    Did --
17       A.    I routinely get requests for
18    information from all of the council
19    members as far as our operations going.
20       Q.    And you routinely answer
21    them; am I correct?
22       A.    Yes.  If they were strictly
23    requests for information.
24       Q.    You didn't receive any
```

Darin Gatti

```
1     direction to remove him?
2        A.    Oh, no.
3        Q.    Now, you just told me that
4     Delaware Avenue was widened from Lewis
5     Street north; am I correct?  In 2012?
6        A.    It was actually created.  It
7     wasn't widened.
8        Q.    It didn't exist back at that
9     point in time?
10       A.    Back in the 1960s --
11    somewhere around there -- Delaware Avenue
12    was stricken from the City plan in that
13    area.
14           So in order to construct the
15    current Delaware Avenue, we had to
16    purchase or condemn all the right-of-way
17    for that, so it did not exist prior to
18    this project.
19       Q.    So in 2012, the street was
20    created beyond Lewis Street going north;
21    am I correct?
22       A.    Yes.
23       Q.    "The street" being Delaware
24    Avenue.
```

Darin Gatti

```
1              And that was part of what
2   ultimately became Mr. Holton's property,
3   by virtue of the deed from the successor
4   to the railroad; you're aware of that,
5   are you not?
6       A.    Yes.  That is a parcel that
7   is separate from his auto salvage
8   business.
9       Q.    When that section was taken,
10  did Mr. Holton still have access to the
11  auto salvage business through Delaware
12  Avenue?
13      A.    Well, Delaware Avenue didn't
14  exist at the time.  So his only access
15  was across private property -- Delaware
16  Avenue was all private property at that
17  time.
18      Q.    So when that 5,733 square
19  feet was condemned for the good of the
20  town in creating Delaware Avenue, that
21  took away his access, be it unlawful or
22  lawful; would I be correct in that
23  statement?  That would be in 2012.
24           MS. CLAIBORNE:  Objection.
```

Darin Gatti

```
1              THE WITNESS:  No.  It
2        actually created an access for
3        him.  He didn't have an access --
4        he did not have a legal access
5        prior to that.  It was all private
6        property.  He was landlocked.
7   BY MR. DURHAM:
8       Q.    The property was landlocked?
9       A.    Yes.  His entire property
10  was landlocked.  So Delaware Avenue
11  actually created a legal access for his
12  property.
13      Q.    And that was only after the
14  deed -- that property was -- that access
15  was deeded by the railroad or the
16  predecessor or successor?
17      A.    Yes.  Which was a deal that
18  the City negotiated between Mr. Holton's
19  attorney and the railroad.
20      Q.    Were you involved in that
21  negotiation?
22      A.    Slightly.
23      Q.    In what way?
24      A.    It was mostly handled by our
```

Darin Gatti

```
1   attorney.  And I --
2            MS. CLAIBORNE:  Objection to
3        the extent it calls for
4        attorney-client communications.
5            You can talk about it, but
6        don't discuss communications with
7        counsel.
8            THE WITNESS:  My role was
9        preparing deed descriptions for
10       the parcels.
11  BY MR. DURHAM:
12      Q.    Okay.  Thank you.
13      Do you recall when you may
14  have first been physically present on the
15  Frankford Creek Right-of-Way on the
16  Richmond Street end?
17      A.    I'd have to say somewhere
18  around 2011, 2012.
19      Q.    Okay.  And at that point in
20  time, you made a determination that Mr.
21  Holton was using at least a portion of
22  that property illegally?
23      A.    Yes.  I received a
24  complaint.
```

Darin Gatti

```
1       Q.    And who did you receive the
2   complaint from?
3       A.    I don't recall.  It may have
4   been a resident.  It might have been one
5   of my inspectors on the construction
6   project who'd routinely drive around the
7   perimeter of the project to ensure that
8   their construction project wasn't causing
9   traffic problems in the neighborhood.
10      Q.    And could it have been Mr.
11  Henon that made a complaint?
12      A.    No, it did not come from
13  city council.
14      Q.    Okay.  It didn't come from
15  his office?
16      A.    No.  As a matter of fact, I
17  knew about it before city counsel did.
18      Q.    Is this property -- that
19  we're going to call the Frankford Creek
20  Right-of-Way -- is it part of the
21  Frankford Creek Greenway?  Have you ever
22  heard that term?
23      A.    The Frankford Creek Greenway
24  is actually a trail project that utilizes
```

Darin Gatti

1  several parcels and land for a pedestrian
2  and bicycle trail in the area of the
3  Frankford Creek.
4       Q.    Do you know whether this
5  parcel ground was meant to be part of
6  that?
7            MS. CLAIBORNE:  Objection to
8       form.
9            Can you just confirm what
10      parcel ground you're talking
11      about?
12 BY MR. DURHAM:
13      Q.    I'm talking the parcel
14 ground that we've refer to as the
15 Frankford Creek Right-of-Way rubbing from
16 Richmond Street to Delaware Avenue?
17      A.    No.  That parcel is
18 specifically for the Frankford Creek and
19 its adjacent floodway.
20      Q.    Okay.  You're familiar as a
21 surveyor to ways of distinguishing where
22 one property might begin and the next
23 might end; are you not?
24      A.    I am not a licensed

Darin Gatti

1  surveyor.  All of the surveyors in the
2  City report to me as the chief engineer
3  and president of the Board of Surveyors,
4  but I am experienced in survey and I am
5  familiar with property line descriptions.
6       Q.    And you normally would have
7  something, either a pin or a monument
8  erected, to distinguish where one
9  property might begin and the other might
10 end; would I be correct?
11      A.    Those are ways of demarcing
12 [sic] properties, however, not all
13 properties have pins at the corners.
14      Q.    So how would one determine
15 on this particular property, the
16 Frankford Creek Right-of-Way, running
17 from Richmond Street to Delaware Avenue,
18 how would one determine where -- you
19 mentioned Mr. Holton and you mentioned an
20 Oliver Painter, I believe you said his
21 name was.
22            How would one determine
23 where Mr. Painter's property began, Mr.
24 Holton's property began and ended?  How

Darin Gatti

1  would you make that determination as a
2  chief engineer of the city?
3       A.    All property lines --
4  anyone -- all properties in the City are
5  referenced to a point on the city plan,
6  which is the -- shall we say the official
7  street map of the City.
8            And our survey districts
9  have all that information.  Anybody that
10 wants to locate a property line can --
11 has several options.  They can go to the
12 city survey district for that particular
13 area and request a property line survey
14 or a stake out.  We actually do also set
15 monuments.
16            But they can also hire any
17 licensed -- any surveyor that's licensed
18 in the state of Pennsylvania to stake out
19 that -- to stake out their property from
20 their deed.
21            The deed description, the
22 description of the property and the deed
23 has the meets and bounds of the property,
24 which is a complete description of the

Darin Gatti

1  property lines and references them to a
2  specific point on the city plan.
3            So -- actually, anyone with
4  a good knowledge of geometry and
5  trigonometry can actually do that
6  themselves, but they -- you know, for an
7  official documentation of where the
8  property line is, they would go to a
9  licensed surveyor or to a survey
10 district.
11      Q.    When you walked on the
12 Frankford Creek Right-of-Way -- it's hard
13 to say.  I get tongue tied saying it so
14 often -- for the first time and made a
15 determination that you believed Mr.
16 Holton was using City property for his
17 business, how could you make that
18 determination?
19            Were there pins there that
20 indicate to you this is where one would
21 end and the other ended?
22            MS. CLAIBORNE:  Objection to
23      form.
24            If you could just clarify to

Darin Gatti

1    which end of the property you're
2  talking about since there's two --
3  BY MR. DURHAM:
4    Q.    Yes.  I'm talking about the
5  eastern end of the property.
6        That's the first end of the
7  property that you believe that Mr. Holton
8  was operating illegally; am I correct?
9    A.    That was the -- yes.  That
10  was the area adjacent to Delaware Avenue.
11    Q.    Correct.
12    A.    And our survey of the area
13  for the project is how we found that out.
14    Q.    And you only took
15  5,733 square feet.
16        Now, you're a math guy, so
17  tell me:  How long and how wide a piece
18  of property is that?
19    A.    I believe it was about
20  30 feet wide and a little over 100 feet
21  long.
22    Q.    Okay.  And the "long"
23  being the portion that was to become
24  Delaware Avenue?

Darin Gatti

1    A.    Yes.  Along the face of
2  Delaware Avenue.
3    Q.    And the 30 feet wide would
4  be going back towards Richmond Street; am
5  I correct?
6    A.    Yes, approximately.
7    Q.    Approximately.  Okay.
8        So from that relatively
9  small area, that's less than, what, about
10  a tenth of an acre?  Maybe two-tenths of
11  an acre?  You were able to ascertain that
12  he was on City property?
13    A.    No.
14    Q.    Okay.  Then how did you
15  ascertain that he was on City property
16  and not the other private property that
17  belonged to the gas company that you
18  described earlier?
19    A.    We -- at the beginning of
20  the project, what we do is an existing
21  survey of all of the properties, and that
22  includes the property lines.
23        So we surveyed all the
24  properties and laid out all the property

Darin Gatti

1  lines in reference to the buildings and
2  all the physical attributes of the area.
3        And that's where we found
4  that someone was operating on the
5  Frankford Creek Right-of-Way.  At the
6  time, we did not know Mr. Holton was part
7  of that.  It was -- the sign on the wall
8  on the gate there was, I think, AB
9  something or other.  It was a business.
10  We had no idea there was a relationship
11  between that business and Mr. Holton.
12        We found out later -- Mr.
13  Holton told me that he actually owned
14  that business.  You know?  So -- it was
15  later that we found out at the beginning,
16  that we had no idea it was Mr. Holton.
17    Q.    And what steps, if any, did
18  you take to get Mr. Holton off of the
19  eastern end of the Frankford Creek
20  Right-of-Way that you found out that he
21  was operating on?
22    A.    After multiple meetings with
23  Mr. Holton and his attorney, we
24  eventually, you know, showed him the

Darin Gatti

1  deed -- you know, went over the deeds,
2  did stake out, showed him plans and
3  eventually, he agreed to vacate the area
4  and signed -- specifically signed an
5  agreement to vacate the Frankford Creek
6  Right-of-Way.
7    Q.    And would you have a copy of
8  that agreement?
9    A.    Not on me, but we do.
10    Q.    If you pulled it out of your
11  pocket, I would have been surprised.
12        MR. DURHAM:  Would you
13        provide us a copy of that?
14        MS. CLAIBORNE:  I can go get
15        it right now if you want.
16        MR. DURHAM:  Well, if you
17        want, you can, or we can wait
18        until we're done.
19        MS. CLAIBORNE:  It's filed
20        on the docket with Mr. Holton's
21        case.
22  BY MR. DURHAM:
23    Q.    Okay.  Did you cause any
24  citations at that point in time when you

Darin Gatti

1  were negotiating with Mr. Holton to
2  remove himself from the Frankford Creek
3  Right-of-Way, I guess, Mr. Holton caused
4  to be issued?
5          MS. CLAIBORNE:  Objection to
6      form.
7          You can answer.
8          THE WITNESS:  I never
9      actually issued any citations.
10 BY MR. DURHAM:
11     Q.    You don't issue citations
12 anyway, do you?
13     A.    I do for street issues, yes.
14         However, outside of the
15 street right-of-way, citations is the
16 jurisdiction of department of Licenses &
17 Inspection.
18         So when I see -- if I see
19 violations that are not within the street
20 right-of-way, I notify Licenses &
21 Inspection, they do their own inspection
22 and verify codes and make -- and then
23 issue violations as appropriate.
24         I rarely get any information

Darin Gatti

1  back when I forward anything over to L&I.
2  It's their jurisdiction, so there's not
3  generally a need for me to be involved at
4  that point unless they need my expertise
5  on something.
6      Q.    Do you remember ever having
7  to deal with Mr. Creedon and his
8  business, K Squad, at that location, the
9  Frankford Creek Right-of-Way location
10 between 2010 and 2018?
11     A.    Yes.  When I saw a sign go
12 up for K Squad, at that time, I did not
13 know Mr. Holton was involved in any shape
14 or form.  I notified L&I of a business
15 operating on the Frankford Creek
16 Right-of-Way.
17     Q.    And at which end --
18     A.    This is at Richmond Street.
19     Q.    Thank you.
20     A.    And I know this because from
21 the plans that we had put together and my
22 own familiarity with the City
23 right-of-ways, I know that there was no
24 private property located between the

Darin Gatti

1  railroad and Frankford Creek because the
2  Frankford Creek Right-of-Way goes right
3  up against the railroad on Richmond
4  Street.
5          And so anyone operating in
6  that area is operating on City property.
7      Q.    Okay.  And do you know what
8  happened to K Squad?
9          Do you know whether they
10 continued to operate there or if they
11 moved their business prior to your
12 closing everything down in October of
13 2018?
14         MS. CLAIBORNE:  Objection to
15     form.
16         You can answer.
17         THE WITNESS:  They continued
18     to operate through that, you
19     know -- from that time up until
20     2018 when we physically removed
21     them from our property.
22 BY MR. DURHAM:
23     Q.    Were you involved -- in the
24 2016-2017 timeframe, were you involved

Darin Gatti

1  with K Squad moving away from the front
2  of the Richmond Street end of the
3  Frankford Creek Right-of-Way and moving
4  back on to property actually owned by Mr.
5  Holton?
6      A.    I was not aware that they
7  ever moved.  If they had moved away from
8  Richmond Street, I would not have had to
9  evict them.
10     Q.    Okay.  We'll get to that in
11 just a very short period of time.
12         You mentioned earlier about
13 some streets that had -- some properties
14 had misleading addresses.  Are they in
15 that same area where Mr. Holton is such
16 that 4085 doesn't actually reach Richmond
17 Street?
18         Do you understand my
19 question?
20         MS. CLAIBORNE:  Objection to
21     form.
22         THE WITNESS:  Yes.  Mr.
23     Holton's auto salvage business on
24     Delaware Avenue had a Richmond

1 Street address.  That is not
2 correct.
3         MR. DURHAM:  Right.
4 BY MR. DURHAM:
5     Q.    Are you familiar with other
6 properties with the same type of problem
7 is what I'm asking you.
8     A.    It comes up every now and
9 then.
10        You know, Mr. Holton -- his
11 licenses have multiple addresses and how
12 he got a Richmond Street address for a
13 property that fronts on Delaware Avenue,
14 I have no idea how that happened.
15     Q.    Obviously -- does your
16 department assign property addresses?
17     A.    No.
18     Q.    And do you know who does?
19     A.    The Office of Property
20 Assessments, the OPA.  They give the
21 official addresses.  However, there have
22 been cases where people have gone to the
23 Post Office and gotten the Post Office to
24 give them an address for a property which

1 really isn't official and they use that.
2        We -- you know, we expect
3 that somewhere along the line, someone
4 got these addresses for this property --
5 for these parcels as mailing addresses,
6 not necessarily legal property addresses,
7 from the Post Office.
8     Q.    But you don't know that for
9 sure?
10     A.    No.  It's just a -- it's
11 just a theory of how it -- how the
12 problem got created to begin with, which
13 was --
14     Q.    And do you know --
15     A.    -- prior to Mr. Holton
16 owning the property.
17     Q.    I'm sorry.  I didn't mean to
18 interrupt you.
19        Prior to Mr. Holton -- so
20 you don't believe it was Mr. Holton that
21 did that; am I correct?
22     A.    No.  I think it happened
23 before he...
24     Q.    And do you know who he

1 purchased the property from -- Mr. Holton
2 purchased the property from?
3     A.    From Albert Bonn Christiani.
4     Q.    And that's one of the names
5 you mentioned earlier, along part of the
6 lots in the eastern corner that you --
7     A.    There was -- yes.  These
8 were -- there were several property
9 owners since the railroad subdivided that
10 it out.
11     Q.    Does the address 4887 exist
12 on any city map -- 47 Richmond Street?
13     A.    It...
14     Q.    That you're aware of?
15     A.    It shouldn't.
16     Q.    Did you file any reports, be
17 it oral or in writing, concerning whether
18 or not Mr. Holton's property was
19 polluting the Frankford Creek?
20        MS. CLAIBORNE:  Objection to
21        the term "reports."
22        You can answer.
23 BY MR. DURHAM:
24     Q.    Did you report to anyone?

1 Did you say, write, sign language -- I
2 don't care what you used -- to indicate
3 that Mr. Holton's property was causing
4 pollution in the Frankford Creek?
5     A.    No.
6     Q.    Did you ever testify to that
7 in any court?
8     A.    Nope.
9     Q.    Are you aware of the city
10 ever making that claim?
11     A.    No.
12     Q.    Would you agree with me that
13 an address for a property usually
14 reflects that property being on the named
15 street and the address?
16        MS. CLAIBORNE:  Objection to
17        the extent it calls for
18        speculation.
19        You can answer.
20        THE WITNESS:  When the
21        addresses are properly allocated,
22        yes.
23        However, there are cases of
24        landlocked parcels that have what

Darin Gatti

```
 1      we are referenced to as "rear
 2      properties."  All right?
 3           And the current -- the
 4      actual current official address
 5      for these parcels involved in our
 6      discussion here today, most of them
 7      are designated as rear properties
 8      because they do not have physical
 9      frontage on that street.
10           And Mr. Holton's auto
11      salvage business, the fenced-in
12      area that's fronting on Delaware
13      Avenue, actually has a rear
14      address.
15           The parcel he acquired
16      between his auto salvage and
17      Delaware Avenue is -- actually has
18      the front address on Delaware
19      Avenue because it has Delaware
20      Avenue frontage.
21           His rear property on his
22      deed referenced as Parcel B, which
23      actually fronts on Carbon Street,
24      which is not a real street, was
```

Darin Gatti

```
 1      recently given a Richmond Street
 2      rear address because it does not
 3      have frontage on Richmond Street.
 4      That property ends over 1,000 feet
 5      away from Richmond Street.
 6  BY MR. DURHAM:
 7      Q.   Thank you.  Carbon Street,
 8  is that a paper street?
 9      A.   Yes.  Carbon Street is
10  actually railroad right-of-way.  So it's
11  still shown on our plans as a street, but
12  it's a paper street.  The City has --
13  does not have a right-of-way there.  It
14  is the railroads.
15      Q.   So Carbon Street couldn't be
16  opened as a street at this point in time?
17      A.   It's possible.  That would
18  require agreements with the railroad.
19      Q.   On October 13, 2018, were
20  you present at the property we're going
21  to refer to as the Frankford Creek
22  Right-of-Way owned by the City fronting
23  on Richmond Street?
24      A.   Yes.
```

Darin Gatti

```
 1      Q.   Why were you there?
 2      A.   We were there to remove the
 3  illegal business from the City property.
 4      Q.   You said "we."  Who's "we?"
 5      A.   That would be Streets
 6  Department, Licenses & Inspection, and
 7  the police department.
 8      Q.   Am I correct that there are
 9  no streets on the Frankford Creek
10  Right-of-Way property?
11      A.   That is correct.
12      Q.   So why is the Streets
13  Department involved in something where
14  there are no streets?
15      A.   It was a property issue and
16  as the president of the Board of
17  Surveyors, we did all the research for
18  the -- to define the property lines,
19  stake out where it is.  And as the chief
20  engineer and president of the Board of
21  Surveyors, I am routinely involved in L&I
22  actions.
23      Q.   So that's --
24      A.   I do dozens of
```

Darin Gatti

```
 1  investigations every year for L&I.
 2           MR. DURHAM:  I'm going to
 3      show him one of the pictures you
 4      gave to me.  As a matter of fact,
 5      a few of them.  Those are two of
 6      them.
 7           I'm going to ask the court
 8      reporter to mark -- if you
 9      object -- just Gatti A through D.
10           - - -
11           (At this time, Exhibits
12      Gatti A through D were marked for
13      identification.)
14           - - -
15  BY MR. DURHAM:
16      Q.   Mr. Gatti, I'm going to show
17  you what we marked Gatti A and I'm going
18  to tell you that I received this from
19  your attorney and it does have some
20  information on it.
21           And I'm going to ask you,
22  first of all, have you ever seen that
23  picture before?
24      A.   Probably.  It's from Google
```

Darin Gatti

1  Street View, so this is public
2  information.
3       Q.   Did your attorney ever show
4  you that picture?
5       A.   No, I do not believe she
6  did.
7       Q.   Does that -- what do you see
8  on that picture?  Does it identify where
9  that property is located?
10      A.   I happen to know where it's
11 located.
12      Q.   Okay.
13      A.   It does actually have an
14 address on here as 4094 Richmond Street,
15 but the Google addresses are --
16      Q.   Not accurate.
17      A.   Not necessarily -- they're
18 not official.  Not necessarily -- it's
19 just for references.
20      Q.   Okay.
21      A.   However, this is the -- this
22 is along Richmond Street.  The left side
23 of the picture is actually the waterway
24 and the center of the picture is the

Darin Gatti

1  Frankford -- is the southern side of the
2  Frankford Creek Right-of-Way.  The
3  right-hand side of the picture, there's
4  two billboards that are located on
5  railroad property.
6       Q.   Okay.  And is this the
7  property you know as 4087 Richmond
8  Street, the Frankford Creek Right-of-Way?
9       A.   It's the Frankford Creek
10 Right-of-Way.  It has been referred to as
11 4085 as well as 4087.
12      Q.   I know the numbers are
13 confusing.
14           Do you see a gate there?
15      A.   Yes.
16      Q.   Was that gate there the
17 morning of October 13, 2018?
18      A.   Yeah.  Yes, it was.
19      Q.   And was that gate locked?
20      A.   Yes, it was.
21      Q.   How did you get through the
22 gate?
23      A.   We cut the lock.
24      Q.   I'm going to show you

Darin Gatti

1  Picture B.  I'm going to ask you --
2  first, have you ever seen it before?
3       A.   It's another Google Street
4  View, so I might have seen it.
5       Q.   Did anyone ever bring your
6  attention to it before in reference to
7  this lawsuit?
8       A.   No.
9       Q.   And does that reflect the
10 way the property -- did you ever see the
11 property looking like that?
12      A.   Yes.
13      Q.   Okay.  And that, again, has
14 a fence with a -- appears to be
15 corrugated metal of some type across the
16 front of it?
17      A.   Yes.  They put that up.
18 Prior to that, it was just a regular
19 fence.
20      Q.   And you say "they."  You
21 believe that to be --
22      A.   Whoever was operating in
23 there.  At the time, the sign first said
24 K Squad.  I don't know what the name was

Darin Gatti

1  the day we removed them from the
2  property.
3       Q.   Mr. Holton was there that
4  day; was he not?
5       A.   Yes, he was.
6       Q.   And did you engage in
7  conversation with Mr. Holton about what
8  you were doing?
9       A.   Well, actually, it's what
10 L&I was doing.  L&I was doing eviction; I
11 was sporting L&I with equipment and
12 manpower from the Streets Department,
13 which is a normal cooperation that we
14 have.  We have equipment that they don't
15 have.
16      Q.   Would that be the tow trucks
17 and whatnot?
18      A.   The tow trucks were actually
19 private tow trucks hired by the police
20 department.  The front-end loaders were
21 highway equipment from the Streets
22 Department and there were also several
23 workers there employed by the Streets
24 Department and in our highway unit.

Darin Gatti

1    Q.    Okay.  And I realize you
2  have three different groups there.  The
3  Streets Department, L&I and the police.
4  Who was taking the lead, if you know?
5    A.    Well, L&I has the lead
6  because L&I is the one that issued the
7  cease and desist order on the property,
8  and it was an L&I function that went
9  through the courts as well as dealing
10  with the filed injunctions against us,
11  and they also issued the letters to Mr.
12  Holton, Mr. Creedon, you know, notifying
13  them of our upcoming action.
14    Q.    Okay.
15    A.    And that was delayed twice
16  so he had plenty of notice and plenty of
17  opportunity to move on his own, but he
18  did not -- sorry.  They did not.  I don't
19  know -- and it's still unclear to me who
20  owned what in that area.  There was K
21  Squad, Mr. Creedon, Mr. Holton, but Mr.
22  Holton claims to be the owner of it all
23  or something like that.
24    Q.    Okay.  I'm going to show you

Darin Gatti

1  Exhibit C.  Again, it's a Google Street
2  View.  I was given this, again, by your
3  attorney.
4    A.    Mm-hmm.
5    Q.    Does this reflect the
6  property that we've been talking about,
7  the Frankford Creek Right-of-Way
8  property?
9    A.    Yes, it does.
10    Q.    Okay.  And that picture was
11  taken when?  Does it say at the bottom?
12    A.    November of 2018.  This was
13  after the removal.
14    Q.    Okay.  And is that -- is
15  October the 13th 2018 the last time you
16  were on the property, the day everything
17  was removed?  If you recall.
18    A.    I believe that may have been
19  the last time I was physically on the
20  property.
21    I have been on the sidewalk
22  in front of the property since then, but
23  I don't think I was actually on the
24  property.

Darin Gatti

1    Q.    Were you on the sidewalk in
2  front of the property for any reason
3  related to this lawsuit?
4    A.    No.
5    MS. CLAIBORNE:  Objection to
6    the extent it calls for
7    speculation.
8    You can answer.
9    MR. DURHAM:  He couldn't
10    speculate as to why he was there;
11    he'd know why he was there.
12    MS. CLAIBORNE:  Well, it's
13    the basis of your lawsuit.  It
14    keeps changing and I don't think
15    it's no longer reflective of the
16    pleading so I'm not sure he knows
17    what the basis of the lawsuit is.
18    MR. DURHAM:  Thank you.
19    I'm showing the last picture
20    here.
21  BY MR. DURHAM:
22    Q.    And again, does this picture
23  purport to be the Frankford Creek
24  Right-of-Way property that we've been

Darin Gatti

1  speaking of?
2    A.    Yes.
3    Q.    And if you recall, is this
4  how it looked the last time you saw the
5  property?
6    A.    Pretty close to it.
7    Q.    And this picture does have a
8  date; doesn't it?
9    A.    August 9, 2019.
10    Q.    And that's after everything
11  had been removed; am I correct?
12    A.    Yes.
13    Q.    When you were on the
14  property on October 13, 2018, for the
15  purpose of helping L&I or assisting L&I
16  in its duties, did you see any fencing
17  left on the property that would account
18  for this portion of the property being
19  fenced?
20    A.    The fencing along Richmond
21  Street was still up when we left.  We
22  didn't take the fencing down.  We had to
23  remove the gate --
24    Q.    Okay.  So the gate --

1    A.    -- at one point during the
2  day.
3    Q.    So the gate is -- there is,
4  I presume, four sections of what I would
5  say were corrugated material on Gatti A.
6        Would you agree with that?
7    A.    Yes.
8    Q.    And the middle two would be
9  the gate, presumably?
10   A.    Yes.
11   Q.    Okay.  And they were taken
12 down, correct?  The gates were -- the
13 locks were cut and the gates were
14 removed?
15   A.    For most of the day, I think
16 they were still up, but they may have had
17 to have been removed for the removal of
18 some of the larger tractor-trailers.
19   Q.    And how long do you believe
20 you were on the property the day of
21 October 13, 2018 during this removal?
22   A.    Approximately eight hours.
23   Q.    And by the time you left,
24 were all of the materials, trucks, cars,

1  scrap metal, whatever may have been
2  there, was all of that removed?
3    A.    Most of it was removed.
4        I believe that there was a
5  trailer and some other -- at least one
6  trailer and another structure that were
7  not mobile that had to be demolished by
8  L&I and that happened directly after.
9    Q.    Within a day or so or the
10 same day?
11   A.    It wasn't the same day.  It
12 happened after.  I don't know exactly
13 when.  I really had no involvement in
14 that.
15   Q.    This fence in -- I'm sorry
16 Gatti -- I can't read upside down.
17   A.    B.
18   Q.    B.  Thank you, sir.
19        Is the same fence we see if
20 Gatti A; am I correct?
21   A.    Yes.
22   Q.    And the next picture that I
23 showed you, Gatti C, dated November of
24 2018, those corrugated metal fences are

1  no longer present; am I correct?
2        You see the difference
3  between these pictures?
4    A.    Yes.
5    Q.    You would agree with that,
6  would you not, that that's gone now?
7    A.    The fence is still there.
8  The corrugated metal panels are not.
9    Q.    And were they just attached
10 or do you know how they were attached to
11 the fence?
12   A.    They were loosely just
13 attached to the fence and it was not --
14 it was a safety violation.  So those
15 panels had to be removed.  They weren't
16 adequately -- a wind would pick them up
17 and blow them and kill somebody.
18   Q.    But you didn't see that
19 happen, did you?
20   A.    Them killing anyone?  No.
21   Q.    The wind blowing them away.
22   A.    No.  They were removed to
23 prevent that from happening.  And that
24 happened on the 13th.

1    Q.    Now, when you were there on
2  the 13th helping L&I, you obviously made
3  observations of what was on the property;
4  am I correct?
5    A.    Yes, sir, I did.
6    Q.    And all of those things were
7  being removed from the property that
8  could be removed?  Is that your
9  testimony?
10   A.    Yes.
11   Q.    And you said something about
12 the tow trucks being private companies or
13 individuals hired by -- did you say the
14 police?
15   A.    It was arranged for -- I
16 believe it was arranged for by the police
17 department.
18   Q.    Did you see anyone taking an
19 inventory of what they were removing?
20   A.    Yes.
21   Q.    And do you know who that
22 was?
23   A.    The individual tow trucks
24 were filling out slips for every piece

Darin Gatti

1 they picked up.
2      Q.     And what were they doing
3 with those slips, if you know?
4      A.     I don't know.  That
5 doesn't -- that wasn't -- I wasn't in
6 charge of the whole operation.  I was a
7 support person.
8      Q.     Did you see them hand them
9 off to anyone, such as the police or L&I?
10      A.     I don't know.
11      Q.     Okay.  Do you believe that
12 the items that were taken were the
13 property of Mr. Holton or K Squad or both
14 of them?
15           MS. CLAIBORNE:  Objection to
16      the extent it calls for
17      speculation.
18           You can answer if you know.
19           THE WITNESS:  It was unclear
20      as to exactly who claimed
21      ownership of them.  They both
22      seemed to.
23           However, it was property
24      that they had caused to be there

Darin Gatti

1      on City property.  One of both of
2 them caused those, you know, cars,
3 trucks, equipment, whatever, to be
4 there.
5 BY MR. DURHAM:
6      Q.     There was a scale there,
7 right?  Do you see a scale in that area?
8      A.     Meaning a truck scale?
9      Q.     Yeah.
10      A.     I don't recall that.
11      Q.     How about trailers?  Did you
12 see one or two trailers there?
13      A.     There were trailers, yes.
14      Q.     And there were electric
15 running to those trailer; were there not?
16      A.     Not on the 13th.
17      Q.     Okay.  Prior to -- you had
18 been on the property prior to that day;
19 had you not?
20      A.     Yes.
21      Q.     Okay.  And when you were on
22 the prior days -- prior to October 13th
23 of 2018, were you aware that there
24 were extension cords going from trailer

Darin Gatti

1 to trailer?
2      A.     Yes.
3      Q.     And did you play any part in
4 having the Philadelphia Electric Company
5 discontinue service to those trailers?
6      A.     That was done through L&I.
7      Q.     But you were -- were you
8 made aware of it?
9      A.     Yeah.  That's the normal
10 procedure for a -- you know, for a --
11 this type of operation.  The trailers
12 were there illegally on City property and
13 PECO was notified that it was not a
14 legal, you know, building to be receive
15 power.
16           MS. CLAIBORNE:  Sorry.  It's
17      been about an hour.  If you have
18      like a good bit left or if you
19      have more than 15 or so minutes
20      left, do you mind if we just take
21      a quick break?
22           MR. DURHAM:  Do you want to
23      take a quick break?
24           MS. CLAIBORNE:  Yeah, just

Darin Gatti

1      two seconds.
2           -  -  -
3           (At this time, a short break
4      was taken.)
5           -  -  -
6           MR. DURHAM:  Back on the
7      record.
8 BY MR. DURHAM:
9      Q.     On October 13, 2018, were
10 you already aware that Mr. Holton owned
11 the back lot of 4085 Richmond Street with
12 the back lot coming off of Delaware
13 Avenue, whichever term you prefer to use?
14      A.     Yes.  Mr. Holton, on his
15 deed, had the description for two
16 parcels, a Parcel A and Parcel B.  One on
17 either side of Carbon Street.
18      Q.     Thank you.
19           Did you make any statements
20 as to what should happen to the inventory
21 being taken off of the Frankford Creek
22 Right-of-Way?
23      A.     No, I did not.
24      Q.     Did anyone make any

Darin Gatti

1 suggestion, L&I, yourself, the police,
2 that that just be moved back into the
3 actual area that Mr. Holton owned under a
4 deed?
5      A.   In a letter from the L&I
6 commissioner to Mr. Holton and Mr.
7 Creedon, he was given several months in
8 order to remove all material from City
9 property and was notified that any
10 material left after a certain date --
11 which was prior to October 13th -- would
12 be impounded by the City.
13      Q.   Do you know where that
14 inventory is today that was impounded by
15 the City?
16      A.   I do not personally know.
17 There is a legal process for the removal
18 of abandoned vehicles and we considered
19 all of these vehicles abandoned on City
20 property.  And the -- as far as I know,
21 that's the process that was issued.
22           The company -- the tow
23 company records the vehicle
24 identification numbers and creates some

Darin Gatti

1 sort of record for each vehicle removed.
2      Q.   Were you made aware of any
3 citations concerning the use of the
4 Frankford Creek Right-of-Way that were
5 given to Mr. Holton and Mr. Creedon?
6 Were you aware that the L&I cited them?
7           MS. CLAIBORNE:  Objection to
8      form.
9           If you can specify the time
10      period that you're referring to.
11           MR. DURHAM:  Let me look at
12      the citations.  I can do that.
13 BY MR. DURHAM:
14      Q.   Do you know whether in the
15 calendar year of 2017, beginning as early
16 as March 2, 2017, whether or not the City
17 department of Licenses & Inspections
18 issued any violations to Mr. Holton
19 and/or Mr. Creedon concerning the use of
20 this property?
21      A.   I believe there were
22 violations.  I don't remember off the top
23 of my head what the specific violations
24 were.  Some of them could have been use,

Darin Gatti

1 some of them could have been related to
2 the operations.
3      Q.   And, if you know, was one of
4 them for having the grass too high in the
5 area?
6      A.   Off of top of my head, I
7 don't remember that one.
8      Q.   Let me find it for you.
9           And those violations, they
10 were given time to correct those
11 violations; am I correct?
12      A.   I'm not L&I.  That's...
13      Q.   You work with L&I, don't
14 you?
15      A.   I work with them, but I
16 don't issue violations, so I have no
17 control of those violations of how
18 they're implemented.
19           Most violations do -- just
20 in common knowledge, most violations
21 allow a certain time period for
22 correction, some violations are
23 immediate.
24      Q.   But most, as you said, are

Darin Gatti

1 given time to correct them?
2      A.   Yeah.  Each violation gives
3 a description as far as what -- if there
4 is a time to rectify, they do.  If there
5 is an imminently dangerous condition,
6 it's immediate.  There is no time to do
7 it.  It's an immediate closure.  So
8 there's a whole range.  And I'm not
9 involved in any of those determinations.
10      Q.   Okay.  During this entire
11 period from 2012 through 2018 when the
12 alleged violations, or if you want to
13 call them "the violations," on the use of
14 the City's property known as the
15 Frankford Creek Right-of-Way, the City
16 was -- you condemn the City was the owner
17 all the time; am I right?
18      A.   Yes.
19      Q.   Do you know who erected the
20 gates that we see in these first two
21 pictures, Gatti A and Gatti B?
22      A.   No, I don't have any direct
23 knowledge of who erected what there.
24      Q.   But you -- no one that you

Darin Gatti

1   were aware of from the City's side had a
2   key to those gates; am I correct?
3        A.   I don't know.
4        Q.   You told me you gained
5   entrance by cutting the locks; is that
6   not right?
7        A.   Yes.
8        Q.   And if you had a key, you
9   wouldn't have cut the lock; would you?
10       A.   That's correct.
11            MS. CLAIBORNE:  Objection to
12       form.  You can answer.
13            THE WITNESS:  That's
14       correct.  If I had a key, I would
15       not cut the lock.
16   BY MR. DURHAM:
17       Q.   You said -- you told me you
18   were there for about eight hours on
19   October the 13th; am I correct?
20       A.   Yes.
21       Q.   Okay.  2018.  Just so we're
22   clear on the date.
23            Mr. Henon came to the
24   property that day; did he not?

Darin Gatti

1        A.   I don't remember seeing him
2   there.  I did see one of his staff
3   members.
4        Q.   And did you speak to his
5   staff members that happened to be there?
6        A.   Just to say hello.
7        Q.   Do you know how he was aware
8   of the fact that the lot was being
9   cleared that day?
10            MS. CLAIBORNE:  Objection.
11       Assumes facts not in evidence.
12            You can answer.
13            THE WITNESS:  I don't know.
14       A lot of people knew that we
15       were taking an action that day,
16       including Mr. Holton.
17            So for all knew, Mr. Holton
18       called Mr. Henon and told him
19       about it.  I didn't.
20   BY MR. DURHAM:
21       Q.   Did you know Mr. Holton and
22   Mr. Henon to have a cordial relationship?
23       A.   Nope.
24       Q.   So you didn't -- you didn't

Darin Gatti

1   call Mr. Henon, did you authorize anybody
2   else to call Mr. Henon to come to the
3   site?
4        A.   I -- nobody asked Mr. Henon
5   to come to the site that I'm aware of.
6        Q.   That wasn't --
7        A.   If he came to the site, he
8   came on his own accord.
9        Q.   That wasn't my question.  My
10   question was very simple.
11            Did you authorize someone
12   else to advise Mr. Henon of what was
13   going to be happening that day?  You've
14   already testified you didn't, and I
15   believe you.
16            I'm asking:  Did you
17   authorize someone else, either on that
18   task force, for lack of a better term, or
19   from your office to notify Mr. Henon or
20   his office of your activities?
21       A.   Someone on my team might
22   have given him notice.  I mean, city
23   council asks us for updates on projects
24   all the time.  And periodically, we would

Darin Gatti

1   get requests from Mr. Henon's office
2   about the progress since this eviction
3   took quite a long time in order to come
4   to fruition.
5            So any one of those phone
6   calls, someone could have mentioned to
7   him that we were -- that we had set a
8   date to go out there.  That's common
9   practice.  We have to -- everyone's
10   supposed to know about -- you know, since
11   we're coordinating through three
12   different departments, it's not a -- it's
13   not a secret, you know, what we're doing.
14            As a matter of fact, Mr.
15   Holton knew we were going to be out
16   there.  So anybody could have been known
17   that we were going to be out there.  It
18   wasn't a secret by any stretch of the
19   imagination.
20            I might have mentioned it to
21   Mr. Henon in passing when he asked anyone
22   else on the team, L&I or the police
23   department might have mentioned it to
24   his -- either Mr. Henon or his staff.

Darin Gatti

1   Most of my contact with Mr.
2  Henon's office was through his staff
3  members.  I only had maybe two or three
4  conversations with him during that whole
5  time period.
6      Q.   And "the whole time period"
7  being what?
8      A.   2012 through 2018.
9      Q.   What survey district or --
10 was this property located in?
11     A.   This is the 5th Survey
12 District, which located on Rising Sun
13 Avenue.
14     Q.   And I'm not familiar with
15 the City of Philadelphia election, so I'm
16 going to ask the question.  I have no
17 idea what the answer might be.
18         Is Mr. Henon -- does he
19 represent the 5th Survey District as part
20 of his district or does he represent the
21 entire city, do you know?
22     A.   He has a specific district.
23 His council district.  The boundaries of
24 the 5th Survey District actually are

Darin Gatti

1  parts of several different council
2  districts.  This particular location is
3  within Councilman Henon's district.
4      Q.   And Councilman Henon, are
5  you aware that he had made public
6  statements about getting rid of junkyards
7  in that area?
8      A.   Yes.  And there's a --
9  there's actually a junkyard task force.
10     Q.   Are you on that task force?
11     A.   We are a part of it.
12         We support the task force
13 with information.  The survey districts
14 supply the task force with property line
15 information when they do junkyard
16 inspections, and this is a been in place
17 for years and years.
18         And they do -- you know,
19 they handle problem junkyards, illegal
20 junkyards, do inspections, respond to
21 complaints regarding junkyards.  And I
22 believe there is some part of council
23 that has a committee on -- that covers
24 something like that.

Darin Gatti

1      Mr. Henon happened to be, at
2  the time, to be part on Streets and
3  Services Committee of city council.
4      Q.   So that would include your
5  department?
6      A.   It includes aspects.  We
7  don't report to them, but that's the --
8  that's the city council committee that
9  hears ordnances and motions and, you
10 know, addresses certain aspects.
11         When an ordnance comes into
12 council, instead of going to the full
13 council, its goes to a specific committee
14 first for review.  That committee then
15 has their own hearings on that particular
16 topic because we have so many ordnances
17 coming in at any one time.  You can't
18 have one committee to go to them all, so
19 they break them up into different
20 categories.
21         And Mr. Henon was on the
22 Streets and Services, which handles a lot
23 of Streets Department ordnances, but also
24 other types of ordnances.

Darin Gatti

1      Q.   You're aware that Mr. Henon
2  is under federal investigation -- was
3  indicted.  You're aware of that?
4         MS. CLAIBORNE:  Objection.
5         MR. DURHAM:  You can answer.
6         THE WITNESS:  I did not know
7      he was indicted.  I try to stay
8      out of politics and stuff like
9      that, but...
10 BY MR. DURHAM:
11     Q.   Were you contacted by the
12 FBI in connection to Mr. Henon?
13     A.   I have not been --
14         MS. CLAIBORNE:  Objection to
15     the extent that it calls for
16     information relating to ongoing
17     criminal investigation.  That's
18     privileged information and I'm
19     instructing you not to answer that
20     question.
21         MR. DURHAM:  It's not
22     privileged information unless he's
23     getting indicted also.
24         MS. CLAIBORNE:  That's not

```
1        correct.  That's absolutely not
2        correct.  If you want to go to
3        Court on that, have a field day.
4              MR. DURHAM:  We can.
5              I have no objection going to
6        the Court on that or any other
7        issue.
8              MS. CLAIBORNE:  Okay.  Move
9        along, please.
10  BY MR. DURHAM:
11       Q.    Has the FBI indicated to you
12  that you're a target?
13       A.    I have not had any
14  communications with the FBI in my entire
15  life.
16             MR. DURHAM:  Thank you.
17             I have no further questions
18       for you.  I appreciate your time
19       and your answering all the
20       questions that I asked.
21                   -  -  -
22             (Deposition was concluded at
23       12:02 p.m.)
24
```

```
1                   CERTIFICATION
2
3
4
5
6        I, Emily Andreasen, certify that
7   the witness was duly sworn by me and that
8   the deposition is a true and accurate
9   record of the testimony given by the
10  witness.
11
12
13
14   _____
15        Emily Andreasen
        Court Reporter and Notary Public
16        Dated:
17
18
19
20  (The foregoing certification of this
21  transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)
```